UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARTIN CHAVEZ-ZARATE et al.,<br><br>Defendant. | No.  1:98-cr-05149-NONE<br><br>ORDER DENYING DEFENDANT'S MOTION AND IMMEDIATE MOTION FOR COMPASSIONATE RELEASE<br><br>(Doc. Nos. 333, 342) |

Pending before the court is a motion for a reduction of sentence and a subsequently filed request for the immediate granting of relief filed on behalf of defendant Martin Chavez-Zarate pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Doc. Nos. 333, 342.)  The motion is premised upon defendant Chavez-Zarate's medical condition, and the request for immediate relief is largely based upon both the defendant's medical issues and the risks posed to him by the ongoing coronavirus ("COVID-19") pandemic.  (*Id.*)  For the reasons set forth below, defendant's motions will be denied.

**BACKGROUND**

On August 27, 1998, defendant was charged by way of a superseding indictment for his participation in a large-scale cocaine distribution ring.  (Doc. No. 6.)  Specifically, defendant was charged in Count 1 of the superseding indictment with conspiracy to distribute and possess with

1

1  the intent to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1), and in Counts 2
2  through 5 with money laundering and aiding and abetting money laundering in violation of 18
3  U.S.C. §§ 1956(a)(1)(B)(i) and 2. (*Id*.) In October of 1999, the case proceeded to jury trial
4  against defendant Chavez-Zarate and his two co-defendants. Evidence presented at that trial
5  indicated that defendant Chavez-Zarate was a major distributor of cocaine with close associations
6  to drug cartels in Colombia and Mexico, and that he played a leadership role in securing over 350
7  kilograms (770 pounds) of cocaine intended for distribution in Chicago in October of 1997.[1] All
8  three defendants were convicted by the jury in October of 1999 at the conclusion of their two-
9  week long trial, with defendant Chavez-Zarate being found guilty as to all five counts in which he
10 was charged. (Doc. No. 184.)

11 On March 20, 2000, defendant was sentenced to a life term of imprisonment in the
12 custody of the U.S. Bureau of Prisons ("BOP"). (Doc. Nos. 179, 184.) Defendant's life term of
13 imprisonment was reduced by order of this court in September of 2018 to a 405 month term of
14 imprisonment in light of amendments to the Sentencing Guidelines in 2014 and revisions to the
15 Drug Quantity Tables under those guidelines, known as Amendment 782 and commonly referred
16 to as "Drugs Minus Two." (Doc. No. 326.) Defendant Chavez-Zarate is currently serving his
17 term of imprisonment at the BOP's Reeves Correctional Institution in Pecos, Texas ("CI
18 Reeves"). (Doc. No. 345 at 2.)

19 On January 23, 2020, defendant filed the pending motion for compassionate release
20 pursuant to 18 U.S.C. § 3582(c)(1)(A). (Doc. No. 333.) On February 3, 2020, the government
21 filed its opposition to the motion, and on March 24, 2020, defendant filed his reply. (Doc. Nos.
22 338, 341.) On March 27, 2020, defendant filed the pending request for immediate release also
23 pursuant to 18 U.S.C. § 3582(c)(1)(A) in light of circumstances posed by the COVID-19
24 pandemic. (Doc. No. 342.) On April 1, 2020, the government filed its opposition to the
25 immediate motion, and on April 2, 2020, defendant filed his reply thereto. (Doc. Nos. 345, 346.)

---

[1] The initiating of this prosecution pre-dates the CM/ECF system that federal courts have employed for many years. The first electronic entries do not begin to appear on the docket until the second half of 2002. The undersigned has obtained a copy of the presentence report from the U.S. Probation Office and has relied in part upon that document for this background.

The parties then submitted various supplemental filings.  (Doc. Nos. 348, 349, 350, 351.)

## LEGAL STANDARD

A court generally "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances.").  Those limited circumstances include compassionate release in extraordinary cases.  *See United States v. Holden*, __ F. Supp. 3d __, 2020 WL 1673440, at *2 (D. Or. April 6, 2020).  Prior to the enactment of the First Step Act of 2018 ("the FSA"), motions for compassionate release could only be filed by the BOP.  18 U.S.C. § 3582(c)(1)(A) (2002).  Under the FSA, however, imprisoned defendants may now bring their own motions for compassionate release in the district court.  18 U.S.C. § 3582(c)(1)(A) (2018).  In this regard, the FSA specifically provides that a court may

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[2] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –
>
> (i)   extraordinary and compelling reasons warrant such a reduction; or
>
> (ii)  the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the

---

[2]  If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response."  28 C.F.R. § 542.15(a).  If the Regional Director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed."  *Id.*  "Appeal to the General Counsel is the final administrative appeal."  *Id.*  When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights."  *See* 18 U.S.C. § 3582(c)(1)(A).

3

> community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[3]

The applicable policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[4]; *see also United States v. Gonzalez*, No. 2:18-cr-00232-TOR, 2020 WL 1536155, at *2 (E.D. Wash. Mar. 31, 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even though that policy statement was issued before Congress passed the FSA and authorized defendants to file compassionate release motions). However, a large and

---

[3] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020). The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release. *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, LAW360 (Apr. 14, 2020), https://www.law360.com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, LAW360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

[4] The Sentencing Guidelines also require that to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

growing number of district courts across the country have concluded that because the Sentencing Commission has not amended the Guidelines since the enactment of the FSA, courts are not limited by the pre-FSA categories described in U.S.S.G. § 1B1.13 in assessing whether extraordinary and compelling circumstances are presented justifying a reduction of sentence under 18 U.S.C. § 3582(c). *See, e.g.*, *United States v. Parker*, __ F. Supp.3d __, 2020 WL 2572525, at *8–9 (C.D. Cal. May 21, 2020) (collecting cases); *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal. 2019).

In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the defendant bore the initial burden of demonstrating that a sentence reduction was warranted. *See United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998). Although the Ninth Circuit has not specifically addressed the question of which party bears the burden in the context of a motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts that have done so have agreed that the burden remains with the defendant. *See, e.g.*, *United States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, *1 (C.D. Cal. Jan. 31, 2020); *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, *3 (W.D. Wash. May 7, 2020).

## ANALYSIS

As district courts have summarized, in analyzing whether a defendant is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a defendant has satisfied three requirements:

> First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a district court may grant compassionate release only if "extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id.* Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id.*

*Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-CR-00124-LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 2020 WL 2572525, at *4; *United States v. Trent*, Case No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9,

5

2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be "consistent with" the sentencing factors set forth in 18 U.S.C. § 3553(a)).

**A.      Administrative Exhaustion**

Here, defendant asserts that the administrative exhaustion requirement has been satisfied because he submitted a request to the BOP for compassionate release based on his medical conditions on February 11, 2019, and more than 30 days passed without a response to that request being issued. (Doc. Nos. 333 at 2; 328 at 9–12.) The government contends that administrative exhaustion has not been satisfied because defendant failed to raise the specific issue of COVID-19 in his February 11, 2019 request submitted to the BOP and, therefore, according to the government, the court may not consider the risk posed by the COVID-19 pandemic to defendant's health if he remains incarcerated. (Doc. No. 345 at 4.)[5]

In order to exhaust his administrative remedies in this regard, a defendant must have requested compassionate release from BOP on similar grounds asserted in his or her motion filed with the court. *Cf. United States v. Greenhut*, No. 2:18-CR-00048-CAS, 2019 WL 6218952, at *2 (C.D. Cal. Nov. 21, 2019) (finding that exhaustion was not satisfied where the defendant's request to BOP was based on "non-medical grounds" but the motion filed with the court was based on medical grounds). Conversely, where a defendant previously requests compassionate release from the BOP based on medical issues other than the risk posed by COVID-19, and later moves for release in federal court based on those same medical issues with the added threat posed by the COVID-19 pandemic, district courts have considered the additional factual circumstance posed by the pandemic without requiring the defendant to raise that specific argument first with the BOP. *See, e.g.*, *United States v. Muniz*, No. 4:09-CR-0199, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020) (explaining defendant's request to BOP was submitted "long before the

---

[5] The government also contends that in defendant's February 11, 2019 request submitted to the BOP, he merely "indicated that he requested assistance in submitting" a request for compassionate release, rather than making an actual, official request for such relief. (Doc. No. 339 at 4–5.) This argument is unpersuasive. As defendant stated in his February 11, 2019 request to the BOP: "I have attached hereto a Memorandum chronicling my medical status and other reasons why I am requesting to be considered for a 'Compassionate Release.'" (*Id.* at 9.) Nothing more is required of defendant to submit a proper administrative request.

coronavirus was understood to be such a public health crisis" and granting compassionate release); *United States v. Edwards*, No. 6:17-cr-00003, 2020 WL 1650406, at *2–5 (W.D. Va. Apr. 2, 2020) (noting defendant's request for compassionate release "was further substantiated with a particularized showing that he is susceptible to contracting COVID-19," even though his request to the BOP was first made in August 2019). As one district court has explained in rejecting an argument similar to the one advanced by the government here:

> If the Government is suggesting that this court—which has undoubted jurisdiction because Resnick's original application for compassionate release has been exhausted—cannot take into account things that have occurred since February 26—things that render Resnick's situation even more parlous than it was a month ago, because he has not "exhausted" those grounds, I am again constrained to disagree. I am considering Resnick's situation today. I would be a fool not to consider what has happened in this country in the 35 days since Resnick originally applied for compassionate release.

*United States v. Resnick*, 14 CR 810 (CM), 2020 WL 1651508, at *6 (S.D.N.Y. Apr. 2, 2020).

The government has cited to a number of court decisions in arguing that defendant Chavez-Zarate must nonetheless be required to specifically request compassionate release from the BOP based upon the risk to his health presented by the COVID-19 pandemic. The court finds the government's reliance upon the cited cases to be misplaced for the reasons indicated above. Moreover, although the factual record before the courts in the cases relied upon by the government is somewhat unclear, it appears that each of them involved situations where the defendant failed to make any attempt whatsoever to pursue his administrative remedies with the BOP. *See, e.g.*, *United States v. Eberhart*, No. 13-cr-00313-PJH, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) (denying a compassionate release motion because "[d]efendant fails to demonstrate the futility of pursuing administrative remedies to excuse his failure to exhaust, or even seek administrative remedies at all . . ."); *United States v. Garza*, No. 18-CR-1745-BAS, 2020 WL 1485782, at *1–2 (S.D. Cal. Mar. 27, 2020) (stating that dismissal of a compassionate release motion is appropriate "where there has been no effort to exhaust administrative remedies").

/////

Accordingly, the court concludes that defendant Chavez-Zarate has satisfied the requirement that he first exhaust his BOP administrative remedies before bringing his motion for compassionate release before the court because he filed the pending motion more than 30 days after submitting his request for compassionate release to the BOP and no action was taken in response thereto. (*See* Doc. Nos. 333 at 2; 328 at 9–12.) The court will therefore turn to the merits of defendant's motions.[6]

**B.    Extraordinary and Compelling Reasons**

"Extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons." U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D). Even though the catch-all "other reasons" was included in the policy statement at a time when only BOP could bring a compassionate release motion, courts have agreed that it may be relied upon by defendants bringing their own motions under the FSA. *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-236-JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

Thus, the medical condition of a defendant may warrant compassionate release where he or she "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required." U.S.S.G. § 1B1.13, cmt. n.1 (A)(i). Non-exhaustive examples of terminal illnesses that may warrant the granting of a compassionate release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id.* In addition to terminal illnesses, a defendant's debilitating physical or mental condition may warrant compassionate release, including when:

/////

/////

---

[6] In a supplemental filing, defendant Chavez-Zarate notes that he submitted an additional request to the Warden at his prison of confinement seeking assistance with obtaining compassionate release on March 18, 2020 and has attached part of that request as an exhibit, reporting that he has not yet received a response to that request. (Doc. No. 351.) The government appears not to dispute these allegations. Therefore, the court concludes that defendant has exhausted his administrative remedies based on these additional facts as well.

>The defendant is
>
>>(I)   suffering from a serious physical or medical condition,
>>
>>(II)  suffering from a serious functional or cognitive impairment, or
>>
>>(III) experiencing deteriorating physical or mental health because of the aging process,
>
>that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* at cmt. n.1 (A)(ii). Where a defendant has moderate medical issues that otherwise might not be sufficient to warrant compassionate release under ordinary circumstances, some courts have concluded that the risks posed by COVID-19 may tip the scale in favor of release in particular situations. *See, e.g.*, *United States v. Rodriguez*, No. 2:03-cr-00271-AB, 2020 WL 1627331, at *10–11 (E.D. Pa. Apr. 1, 2020) ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence. But taken together, they warrant reducing his sentence.").

Compassionate release may also be warranted based on a defendant's age and other related factors. In these situations, "extraordinary and compelling reasons" exist where a "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13, cmt. n.1 (B). In determining a defendant's projected release date, courts may take into account any "good time credits" awarded to the defendant by BOP for "exemplary" behavior in prison as set forth in 18 U.S.C. § 3624(b)(1). *See, e.g.*, *United States v. Burrill*, No. 17-cr-00491-RS, 2020 WL 1846788, at *1 n.1 (N.D. Cal. Apr. 10, 2020).

Here, defendant Chavez-Zarate was initially sentenced in May of 2000 to a term of life imprisonment for his leadership role in a conspiracy to distribute and possess with the intent to distribute a very large amount of cocaine and engaging in money laundering. (Doc. No. 184.) As also noted above, his life term of imprisonment was later reduced to 405 months in light of

amendments to the Sentencing Guidelines in 2014 and revisions to the Drug Quantity Tables. (Doc. No. 326.)  As of the filing of the pending motion in January, defendant has served 257 months in prison, or a little over 63% of his sentence as already modified.  (Doc. No. 333-1 (noting defendant began to receive "jail credit" in this case on August 31, 1998).)  Taking into account the award of good time credits, defendant has now served approximately 75% of his modified sentence.  (Doc. No. 333 at 3–4.)  The government does not dispute this calculation of defendant's remaining sentence.

Defendant is now 66 years old and claims that he suffers from a variety of ailments. (Doc. No. 333 at 3.)  However, the evidentiary support before the court with respect to some of these claimed ailments is somewhat lacking.  While certainly much can change within 20 years, the court notes that at the time of sentencing defendant reported to have no meaningful health issues, other than suffering from some lower back pain.  (Presentence Report at 14.)  In his pending motions for compassionate release, defendant claims that he now suffers from high blood pressure and heart disease which has required him to undergo two heart surgeries, including a "Bypass."  (Doc. Nos. 333 at 4; 328 at 3-4, 10 (defendant's *pro se* request to appoint counsel for purposes of compassionate release).)  According to his BOP medical records, defendant's most recent blood pressure reading was high, placing him in the "hypertension" category.  (Doc. No. 336 (sealed).)  *See High Blood Pressure: High Blood Pressure Symptoms and Causes*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/bloodpressure/about.htm (last visited Aug. 27, 2020) (requiring a systolic reading of 130mm Hg or higher and diastolic reading of 80 mm Hg or higher).  Defendant Chavez-Zarate also claims he has a hernia, hemorrhoids, and an enlarged prostate, among other medical issues.  (Doc. Nos. 333 at 4; *see also* 328.)  The court has been unable to locate any medical records supporting these claims, but the government does not take issue with defendant's contentions in this regard.  In June 2018, defendant was diagnosed with coronary atherosclerosis, "a coronary artery disease caused by the buildup of plaque inside the artery walls, which causes the inside of the arteries to become narrower and slows down the flow of blood."  (Doc. Nos. 333 at 4.)  According to defendant Chavez-Zarate, he was prescribed

/////

nitroglycerin for this condition. (*Id.;* Doc. No. 328 at 18.) Defendant's BOP medical records confirm his diagnosis of coronary atherosclerosis and reflect that he is being treated for this condition. (Doc. No. 336 (sealed).)[7] As recently as last year, defendant stated that he felt some "light pressure" in his chest, but he otherwise appeared to be in good condition.[8] (*See id.*)

According to the U.S. Centers for Disease Control and Prevention ("CDC"), defendant is at higher risk of becoming severely ill were he to contract COVID-19 because of his age and his "coronary artery disease." *See Coronavirus Disease 2019 (COVID-19): People Who Are at Increased Risk for Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited Aug. 27, 2020). Additionally, defendant "might be at an increased risk for severe illness from COVID-19" due to his hypertension and high blood pressure. *Id.* (stating those who suffer from pulmonary hypertension are in fact at risk, as opposed to hypertension generally which "may" place an individual at risk). However, it remains somewhat unclear whether defendant Chavez-Zarate is also at high risk of severe illness if he were to contract COVID-19 due to other ailments, including a "serious heart condition," because the documentary support before the court with respect to those medical conditions is somewhat lacking. *Id.*

Defendant points to the fact that he has had no disciplinary issues while imprisoned and has, in fact, been described as "an exemplary prisoner" by BOP staff. (Doc. Nos. 333 at 4–5; 333-2.) In this regard, defendant Chavez-Zarate was placed in an "Honor Unit" at one of the institutions where he was incarcerated, and he has taken advantage of the educational

---

[7] The court has also been unable to identify medical records specifically reflecting a diagnosis that defendant is suffering from heart disease. (*See* Doc. No. 328 at 17 (attaching BOP medical records reflecting that defendant complained of chest pain but without reflecting a diagnosis).) However, the government also does not contest defendant's claim in this regard. It may be that defendant is referring to his diagnosis of suffering from coronary atherosclerosis, which is well established by the medical record, in asserting that he suffers from heart disease or it may be that he has been so diagnosed but that diagnosis is simply not contained in the medical records currently before the court. For purposes of resolving the present motion, the court will nonetheless assume that defendant is suffering from a heart condition of some type.

[8] The court notes that defendant has only submitted an "excerpt" (i.e., a single page) of defendant's BOP medical records. (Doc. No. 336 at 1 (sealed).)

opportunities provided to him.  (Doc. Nos. 333 at 4; 333-3.)  Defendant's rehabilitation efforts—which the government does not dispute here—may be taken into account in determining whether "extraordinary and compelling reasons" justify compassionate release.  *See, e.g.*, *Rodriguez*, 2020 WL 1627331 at*10–11 (E.D. Pa. Apr. 1, 2020).  However, this fact "is not, by itself, an extraordinary and compelling reason."  U.S.S.G. § 1B1.13, cmt. n.3.

Lastly, if released, defendant's daughters have offered to house him in Tulare, California or Huntington Park, California.  (Doc. No. 333-4.)

Based upon these assertions, defendant Chavez-Zarate argues that "extraordinary and compelling reasons" warrant his release for two reasons:  his medical condition <u>and</u> his age plus other related factors.  Because defendant satisfies the latter criteria, the court need not address in further detail whether defendant's medical conditions alone create "extraordinary and compelling reasons" for his release.  It is undisputed that defendant "is at least 65 years old" and "has served at least 10 years" of his sentence in prison.  *See* U.S.S.G. § 1B1.13, cmt. n.1 (B)(i) and (iii).  Therefore, one issue central to resolution of the pending motions for compassionate release is whether defendant "is experiencing a serious deterioration in physical or mental health because of the aging process."  *Id.* at cmt. n.1 (B)(ii).

Defendant represents that atherosclerosis is "a disease of aging" and a "precursor to a heart attack or stroke" and that his "prostate gland enlargement is also [] a common condition associated with aging in men."  (Doc. No. 333 at 6.)  The government did not discuss the merits of defendant's request in the first opposition it filed to defendant's motion for compassionate release.  (Doc. No. 339.)  In its opposition to defendant's subsequently filed motion for immediate compassionate release, the government argues in somewhat conclusory fashion that defendant is not suffering from a "serious deterioration in health."  (Doc. No. 345 at 7.)  The government also contends that any motion for release based on the general risk posed by COVID-19 "is general, wide-ranging, and would apply to essentially every inmate over 60."  (*Id.*)

Based on the present record, the court is persuaded that defendant is suffering from "a serious deterioration in physical . . . health because of the aging process" due to his coronary atherosclerosis, which also places him at greater risk of becoming severely ill if he were to

contract the COVID-19 virus.  *See* U.S.S.G. § 1B1.13, cmt. n.1(B).  Thus, defendant Chavez-Zarate satisfies all three requirements for a finding of "extraordinary and compelling reasons" under the applicable policy statement because of his coronary artery disease.  *See id.* (requiring also that defendant is at least 65 years old and served at least 10 years or 75% of his sentence, whichever is less).  In focusing on the steps that BOP has taken to provide care for prisoners, the government seeks to have the court apply the more stringent definition of "extraordinary and compelling reasons."  (Doc. No. 345 at 7–10.)  *See* U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I) (requiring a "serious physical . . . condition . . . that substantially diminishes the ability of the defendant to provide self-care within" prison and "from which he . . . is not expected to recover").  However, because defendant has established "extraordinary and compelling reasons" based on other factors, *see* U.S.S.G. § 1B1.13, cmt. n.1(B), he need not demonstrate that he is unable to provide self-care while incarcerated at CI Reeves.

The court observes that while it may have been a close call as to whether defendant Chavez-Zarate could demonstrate "extraordinary and compelling reasons" absent the risks to his health posed by the COVID-19 pandemic, defendant's coronary artery disease when considered along with the risk to him associated with COVID-19, tip the scales in his favor on this point.  *See, e.g.*, *Rodriguez*, 2020 WL 1627331, at *10–11; *United States v. Campagna*, No. 16 Cr. 78-01 (LGS), 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) ("Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's sentence[.]").[9]

/////

/////

---

[9] The court does note, however, that as of August 27, 2020, the BOP is reporting only 10 active COVID-19 cases among prisoners confined at both CI Reeves I and II and zero active cases among staff.  *See COVID-19*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited August 27, 2020).  Thus, it appears from that reporting that the status of any virus outbreak at defendant Chavez-Zarate's institution of confinement has been reasonably controlled.  While the undersigned does not necessarily accept these reported numbers at face value in light of current CDC guidelines with respect to both testing and manner of counting "active cases," there is also no evidence before the court challenging those reported numbers in this case.

For all of these reasons, the undersigned concludes that defendant Chavez-Zarate has established "extraordinary and compelling reasons" in support of his request for compassionate release.

**C.     Consistency With the § 3553(a) Factors**

Although defendant satisfies the first two requirements of his request for compassionate release, it remains his burden in satisfying the third and final requirement. In this regard, any relief to be granted pursuant to 18 U.S.C. § 3582(c)(1)(A) must be consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).[10] *Trent*, 2020 WL 1812242, at *2; *see also Parker*, 2020 WL 2572525, at *11. Here, after careful review of the record, the court concludes that consideration of the § 3553(a) sentencing factors do not support defendant Chavez-Zarate's release at this time.

At the outset, the court notes that neither in defendant's opening motion, nor in his request for immediate relief, does he address the sentencing factors in § 3553(a) in any detail. (*See passim* Doc. Nos. 333, 342.) Regardless, it is not an exaggeration to state that defendant's prosecution in this case was one of the most serious drug trafficking offenses prosecuted in this district at the time. Indeed, defendant Chavez-Zarate's arrest and conviction was recognized as being "the result of an extensive wiretap operation, known as Operation Casablanca, *the largest and most comprehensive drug/money laundering investigation in the history of United States law enforcement*" according to the Drug Enforcement Administration ("DEA"). (Presentence Report at 3 (emphasis added).) As a result of Operation Casablanca, federal law enforcement authorities

---

[10] Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court shall consider: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

14

seized $100 million from 14 financial institutions associated with the Cali drug cartel in Colombia and the Juarez drug cartel in Mexico. (*Id.*) At defendant's trial before this court, the evidence showed that he frequently communicated with an individual who was known to be "Mexico's number one [drug] trafficker of cocaine." (*Id.*) According to the DEA, defendant trafficked cocaine in large quantities for at least a decade, from 1988 through 1997. (*Id.*) Against this backdrop and pursuant to the investigation of this case, federal law enforcement authorities tracked defendant as he traveled across the country, from Fresno to Chicago, to engage in a large cocaine transaction in late 1997 for which he is serving his current term of imprisonment. (*Id.* at 4.) That single transaction involved over 350 kilograms of cocaine, which at the time, had an estimated street value of $4.5 million. (*Id.* at 4, 6.) The government also notes that evidence indicated that defendant Chavez-Zarate had "been involved in the shipment of pistols to narcotics traffickers in Mexico who used the weapons to assassinate competing drug traffickers." (Doc. No. 339 at 3.) Notably, the government in this case also charged defendant, pursuant to 21 U.S.C. § 851, with having previously been convicted of a drug offense in Texas, namely aggravated possession of 400 pounds of marijuana. (Presentence Report at 3, 11.)

Following his conviction on all counts in this case, it was determined that under the U.S. Sentencing Guidelines, defendant Chavez-Zarate's adjusted offense level was 42 (including a four-point increase due to his aggravating leadership role in the criminal conduct) and his criminal history category was II, resulting in a sentencing guideline range calling for a sentence of between 360 months to life imprisonment. (*Id.* at 17–18.) Moreover, his offense level was not adjusted downward for acceptance of responsibility because defendant Chavez-Zarate declined to provide a statement regarding the offense on the advice of counsel, other than stating, "No matter what the newspapers say about me, I want the Judge to know that I have always been a good father." (*Id.* at 9–11.)

In light of all of these circumstances, the district judge who presided over defendant Chavez-Zarate's trial sentenced him to a top-of-the-guidelines term of life imprisonment. (Doc. Nos. 179, 184.) That sentence was, as noted above, later reduced in 2018 to 405 months (33 ¾ years) in prison because of the Drug Minus 2 amendment. (Doc. Nos. 184, 326.) At the time of

defendant Chavez-Zarate's original sentencing, the U.S. Probation Office had recommended a sentence of life in prison. (Presentence Report at 18 ("A Life sentence appears appropriate in this case to deal with issues involving deterrence, incapacitation, just punishment, and long-term protection to the community.").) When defendant's sentence was later reduced, the court applied the § 3553(a) sentencing factors and concluded that a sentence at the revised high-end of the guideline range (accounting for the Drug Minus Two amendment) was still appropriate in light of defendant's underlying criminal conduct. (*See* Doc. No. 326 at 6.) The court imposed that modified sentence over the objection of the government. (*See* Doc. No. 324 at 5 (arguing § 3553(a) weighed against any reduction: "A life sentence was reasonable and remains so.").) However, the court expressly declined to reduce defendant's sentence below the high-end of the new guideline range, stating: "The sentencing judge presided over the trial, heard testimony, and found a sentence at the high end of the range to be appropriate. This Court will not second-guess that judgment." (*Id.*) As of the date of this order, defendant has served approximately 21 ½ years of his almost 34-year (as revised) sentence. (Doc. No. 333-1 at 1.) Taking into account the award of good time credits, defendant Chavez-Zarate still has approximately eight years left to serve on his prison term. *See United States v. Shayota*, No. 1:15-cr-00264-LHK-1, 2020 WL 2733993, at *5–6 (N.D. Cal. May 26, 2020) ("The length of the sentence remaining is an additional factor to consider in any compassionate release analysis, with a longer remaining sentence weighing against granting any such motion." (citation omitted)).

Considerations related to any sentencing disparity also do not weigh in favor of granting defendant's compassionate release. *See* 18 U.S.C. § 3553(a)(6). Although defendant Chavez-Zarate's co-defendants were convicted in connection with their role in the same 350 kilogram cocaine transaction and were sentenced to less time in prison,[11] those two defendants did not play the same leadership role in the drug trafficking and money laundering organization that defendant

---

[11] Defendants Hernandez and Rodriguez were both convicted of the conspiracy charged in count one and were both sentenced to 235 months in prison. (Doc. Nos 169, 170, 215, 220.) It is also important to note that after Hernandez and Rodriguez were arrested in Chicago on October 17, 1997, defendant Chavez-Zarate was able to elude DEA agents who had been following him and fled, flying to his home in Colima, Mexico. (Presentence Report at 7.) He remained a fugitive until his arrest on August 31, 1998. (*Id.*)

Chavez-Zarate played. Indeed, it was apparent that defendants Hernandez and Rodriguez worked at the behest and at the direction of defendant Chavez-Zarate and were simply responsible for loading and transporting the 350 kilograms of cocaine on his behalf. (*See, e.g.*, Presentence Report at 6–7 ("After the arrest of [the co-defendants], monitored telephone conversations indicate [defendant Chavez-Zarate] was arranging to hire attorneys to represent them in connection with the instant drug offense.").) Thus, comparing defendant Chavez-Zarate's sentence to that received by his co-defendants in this case does not reveal any unwarranted sentencing disparity.

Defendant Chavez-Zarate appears to have done very well and engaged in rehabilitative efforts since beginning the service of his term of imprisonment. It is the case that he has not had a disciplinary issue while imprisoned for the last two decades and, in fact, he has availed himself of educational courses taught at his institution of confinement. (Doc. Nos. 333-2, 333-3.) It also appears that defendant's family has remained an important part of his life during his incarceration. (*See* Doc. No. 328 at 11, 13.) Defendant's behavior and good deeds since he began serving his term of imprisonment and his commitment to remaining close to his family over those many years is, of course, highly commendable. Nevertheless, his admirable performance since his imprisonment is not enough to overcome the seriousness of the criminal conduct for which he was convicted in this case.

Finally, the § 3553(a)'s sentencing factors instruct courts to consider whether a particular sentence will "provide the defendant with needed . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). As discussed above, the court recognizes that defendant's medical conditions are sufficiently severe to establish "extraordinary and compelling reasons" that could justify compassionate release if appropriate in light of the other relevant considerations. However, the question under § 3553(a) is different. Based on the somewhat limited BOP medical record submitted by defendant, nothing before the court suggests that defendant is unable to be properly cared for while imprisoned at CI Reeves. Indeed, if anything, the record suggests the opposite. *See United States v. Ayon-Nunez*, No. 1:16-cr-00130-DAD, 2020 WL 704785, at *3 (E.D. Cal. Feb. 12, 2020) ("Chronic conditions that can be managed in

prison are not a sufficient basis for compassionate release.")  Accordingly, defendant's medical conditions are not severe enough to outweigh the other relevant sentencing considerations.

For all of the reasons discussed above, in the undersigned's view, any further reduction of defendant's sentence at this time would not adequately reflect the seriousness of his offenses of conviction, promote respect for the law, provide just punishment, or afford adequate deterrence to criminal conduct.  *See* 18 U.S.C. § 3553(a); *see also United States v. Purry*, No. 2:14-cr-00332-JAD-VCF, 2020 WL 2773477, at *2 (D. Nev. May 28, 2020).  This is the case in light of the extent and severity of defendant Chavez-Zarate's criminal conduct.  *See* 18 U.S.C. § 3553(a)(4).

## CONCLUSION

Defendant has demonstrated "extraordinary and compelling reasons" based on his age, the length of time he has already spent in prison, and because he is suffering from a "serious deterioration" in health due to "the aging process."  *See* U.S.S.G. § 1B1.13, cmt. n.1(B)(ii).  Nonetheless, the court concludes that the granting of compassionate release at this time is not consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a) for the reasons stated above.  Accordingly, defendant's motion for compassionate release and his motion for immediate release (Doc. Nos. 333, 342) are hereby denied at this time.

IT IS SO ORDERED.

Dated:  **August 28, 2020**

UNITED STATES DISTRICT JUDGE